UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BRENT L. RUSSELL,

                         Petitioner,           **No. 11-CV-6466(MAT)**

      -vs-                                   **DECISION AND ORDER**

STEVEN RACETTE,

                         Respondent.
_____

## I.   Introduction

Brent L. Russell ("Russell" or "Petitioner") has filed a pro se habeas corpus application pursuant to 28 U.S.C. § 2254, alleging that he is being held in state custody at Elmira Correctional Facility in violation of his federal constitutional rights. Petitioner's incarceration is the result of a judgment entered on August 22, 2007, in Wyoming County Court, of New York State, following a jury verdict convicting him of Predatory Sexual Assault (N.Y. Penal Law ("P.L.") § 130.95 (1)(b)); Rape in the First Degree (P.L. § 130.35(1));[1] and Unlawful Imprisonment in the First Degree (P.L.§ 135.10).

---

[1]

On March 26, 2010, the Appellate Division, Fourth Department, of New York State Supreme Court modified Russell's conviction by dismissing the rape count because it constituted a lesser included offense of predatory sexual assault. People v. Russell, 71 A.D.3d 1589 (4th Dept. 2010). The Fourth Department otherwise unanimously affirmed the conviction, and the New York Court of Appeals denied leave to appeal on June 23, 2010. People v. Russell, 15 N.Y.3d 756 (2010).

## II.   Factual Background and Procedural History

### A.   Petitioner's Trial

#### 1.   The Prosecution's Case

The victim, C.B., was thirty-seven years-old at the time of trial. Because she did not drive or have a driver's license, she depended on family, friends and sometimes strangers for transportation. On October 30, 2006, she went with her friend Gordon Metcalf ("Metcalf") to Batavia, New York to go shopping. Afterwards, C.B. and Metcalf went to three different bars where they consumed alcoholic beverages over the course of several hours.

At about 6:30 p.m., Metcalf left C.B. at a bar named Poor Boys. C.B. had made arrangements to have two men that she had just met in the bar (Doug Pierson ("Pierson") and Ron Dacey ("Dacey")) drive her home to Warsaw, New York. At around 7:30 or 8 p.m., she went with the men to another bar in Perry, New York called Silver Grill. The men left the bar at approximately 8:10 p.m. so that Pierson could drive Dacey home. Pierson promised to return for C.B., but he did not.

C.B. waited forty-five minutes, at which point Petitioner, whom C.B. had never met before that evening, offered to drive her home. Michael Gambino ("Gambino"), the bartender at Silver Grill, was friends with C.B. and saw her leave with Petitioner at about 8:30 p.m.

Petitioner began driving down a back road that C.B. did not recognize, pulled the car over, and began making sexual advances towards C.B., who turned him down, stating that the bartender knew her and would remember that she had left with him. Petitioner then pulled out what C.B. believed to be a knife and held it six to twelve inches from her face. As Petitioner straddled C.B.'s lap. C.B. told him, "It doesn't have to be like this." Petitioner persisted, saying, "I am going to have sex with you." T.301. Pleading with him not to hurt her, C.B. told Petitioner take whatever he wanted from her purse and to do whatever he wanted.

Petitioner eventually put the knife in the backseat, but raped C.B. anyway, inserting his penis into her vagina and having intercourse with her against her will until he ejaculated. Afterwards, Petitioner said, "I'm sorry, I shouldn't have done that to you." T.306.

C.B. convinced Petitioner to take her back to Warsaw to rent a movie and order pizza. She thought that she could get assistance at the video rental store.

Petitioner agreed, and they drove to Hollywood Video in Warsaw. After browsing for some time, C.B. was able to get the attention of employee Diana Klink ("Klink") and mouthed to her, "Call 911." T.308-311, 463. Klink went in the back room and informed her supervisor, Debora Sweet ("Sweet"), about the situation. T.463-64. Observing that C.B. appeared nervous and in

need of help, Sweet called 911. At that point, Petitioner left the store by himself.

Klink was able to give Petitioner's license plate number to Sweet, who was on the phone with the 911 operator. At that point, C.B. became hysterical and told Sweet and Klink that Petitioner had raped her at knifepoint.

The prosecutor played the surveillance tape from Hollywood Video for the jury. It depicted Petitioner and C.B. entering the store at approximately 9:29 p.m. The tape showed C.B. speaking to Klink at 9:36 p.m. At 9:39 p.m., Petitioner was nearing the store exit. Soon thereafter Sweet walked to the front and Petitioner left the store. C.B. followed him out. C.B. was then seen speaking to Klink and Sweet inside the store while Sweet was on the phone.

The police arrived and escorted C.B. to the hospital where Kathy Hare ("Hare"), a certified sexual assault nurse examiner, performed a pelvic exam and a compiled a rape kit. Hare testified that there was redness at the base of C.B.'s vagina that was consistent with either forcible or consensual intercourse. Hare also testified that the medical records contained the notes of another nurse who observed that multiple fingernails on C.B.'s hand were broken and jagged. C.B. stated that prior to the assault her fingernails were not broken.

While C.B. was in the hospital, the police located Petitioner's car parked at the residence of his friend, Al Hartman

("Hartman"). Petitioner agreed to come to the police barracks for questioning, where he waived his <u>Miranda</u> rights and was interviewed by Investigator John Neeley.

At approximately 2:30 a.m., the police brought C.B. to the state troopers' barracks. During Investigator Jim Zittle's interview of C.B., she became ill during the interview from some of the medications she had been given at the hospital. Because the investigators were unable to complete their interview with C.B., Petitioner was not arrested that night.

Two days later, an arrest warrant was issued for Petitioner, whom the police believed had fled. Petitioner was arrested a month later in Miami, Florida, and extradited to New York.

While State Troopers Robert Fusani and Craig Dipaolo were processing Petitioner's arrest, he announced, "I can't help it if she was hooking and didn't get paid for it." T.547.

## 2. The Defense Case

Pierson testified that he and Dacey were at Poor Boys Saloon on October 30, 2006, where they met C.B. for the first time. Petitioner was also at Poor Boys Saloon. Pierson told Petitioner that they were all going to Silver Grill. Before leaving, however, Pierson saw C.B. go to the kitchen and kiss the bartender, Gambino. Pierson decided that they would leave C.B. at the bar because she was "using" them for a ride. Pierson did not see Petitioner at Silver Grill.

-5-

Samantha Fitzgerald ("Fitzgerald"), a bartender at Poor Boys, served C.B. four to six Bud Light beers between the hours of 3:30 and 6 p.m. Petitioner arrived at the bar at around 6:00 p.m. and had one beer before Fitzgerald's shift ended.

Kimberly Costello ("Costello") also was a bartender at Poor Boys, and she worked from 6 p.m. until 2 a.m. On the night of October 30, 2006, she served one beer to C.B. and one beer to Petitioner, who was sitting five bar stools away. T.630-32. At that point, according to Costello, C.B. left the bar with Pierson and Dacey. Petitioner stayed at the bar for an hour after C.B. left the bar.

George Way ("Way"), an alcohol and substance abuse counselor, testified regarding blood alcohol level and its effect on behavior.

Petitioner testified that he was thirty-one years-old at the time of trial and that prior to this incident, he resided in a camper on his parents' property located in Bliss, New York. Petitioner stated that he arrived at Poor Boys bar at approximately 6:30 p.m. and that C.B. was at the bar with Pierson and Dacey. Petitioner chatted C.B. while at Poor Boys and gave her money to play a song on the juke box.

At C.B.'s invitation, Petitioner went to Silver Grill around 7:30 or 8 p.m. While there, Petitioner and C.B. spoke about their respective relationship statuses and their children. C.B. then

asked Petitioner to drive her home to Warsaw because the men she was with

had left. Petitioner testified that, while in the car, C.B. was touching Petitioner's arm and rubbing his neck. He then rubbed C.B.'s thigh and she did not react. Petitioner exposed himself to C.B., asked her if "she care[d] to give [him] a blow job", and she agreed. T.671. He then pulled off the road where C.B. removed her pants and shoes and they engaged in sexual intercourse. T.671-72. Afterwards, they kissed, had a cigarette, and made plans for the rest of the night.

Petitioner took C.B. to the video store but left her there when she began to act rudely towards him. Petitioner then went to his friend Hartman's house to smoke crack-cocaine. Petitioner was arrested there, and after he gave a statement, he was released. He explained that he had gone to Florida to seek employment. When he was arrested in Miami, he agreed to be returned to New York to face the rape charges. Petitioner admitted that he told the state troopers that C.B. was a "hooker" and that he should have paid her. T.702.

### 3. The Prosecution's Rebuttal

Robert Wilson ("Wilson"), a long-time friend of Petitioner's, testified that Petitioner had confided in him that he was in trouble because of a girl that he had met. Petitioner told Wilson

that he met the girl at a bar and that in the car they had touched each other, but when Petitioner tried to have sex with her she resisted and said no. Petitioner told Wilson that there was choking involved. Two weeks later Petitioner spoke to Wilson over the phone and told him that he was going to Louisiana, and asked for bus fare.

Wilson and Petitioner another conversation later on when Petitioner was in the Wyoming County Jail. Wilson asked petitioner if there had been a knife and Petitioner replied, "[E]ven if there was a knife, they wouldn't have found it anyways." T.730.

### 4. Verdict and Sentence

The jury found Petitioner guilty of Predatory Sexual Assault, Rape in the First Degree, and Unlawful Imprisonment. Petitioner was acquitted of Criminal Possession of a Weapon in the Third Degree. On August 22, 2007, Petitioner was sentenced to an indeterminate term of from 17½ years to life imprisonment on the predatory sexual assault conviction, a determinate term of 20 years imprisonment for the rape conviction, and a indeterminate term of from 1½ to 3 years imprisonment for the unlawful imprisonment conviction. All of the sentences were set to run concurrently. The trial court also imposed a term of five years post-release supervision.

### 5.    Post-Conviction Proceedings

As noted above, Petitioner's conviction was partially modified on direct appeal. He did not file any collateral applications for post-conviction relief in state court.

### B.    The Federal Habeas Petition

On September 9, 2011, Petitioner timely filed this pro se habeas petition asserting the following grounds for relief: (1) the evidence was legally insufficient to support the convictions of predatory sexual assault, first degree rape, and unlawful imprisonment, based on his acquittal of the weapon possession charge; (2) because the jury did not rely on "legal requirements" in finding Petitioner guilty of counts 1 through 3; the jury's inferences were unreasonable; (3) the verdicts were against the weight of the evidence; and (4) the verdicts were repugnant. Respondent answered the petition, conceding that Russell had exhausted his state court remedies, see 28 U.S.C. § 2254(b)(1)(A), and arguing that all of the claims lack merit. Russell submitted a traverse.

For the reasons that following, the request for a writ of habeas corpus is denied, and the petition is dismissed.

## III. Discussion

### A.    Legal Insufficiency of the Evidence

Petitioner claims, as he did in his Appellate Division brief, that the evidence presented at trial was legally insufficient to

support his convictions of predatory sexual assault, first degree rape, and unlawful imprisonment. The Appellate Division reversed and dismissed Petitioner's conviction of first degree rape, finding that it was a lesser included count of predatory sexual assault. Russell, 71 A.D.3d at 1590. Thus, Petitioner's legal sufficiency challenge to the rape count is now moot. See Taplin v. Rabideau, 9:04-CV-935 FJS/RFT 2008 WL 2559374, at *16 (N.D.N.Y. June 23, 2008) ("Since the state court already vacated Petitioner's conviction on count four of the indictment and dismissed it, Petitioner's habeas claim with regard to that count is moot.") (citations omitted). The Appellate Division rejected the legal sufficiency claim with respect to the convictions for predatory sexual assault and unlawful imprisonment. That decision was a correct application of federal law.

Under the clearly established standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979), a habeas petitioner "bears a very heavy burden" when challenging the legal sufficiency of his state criminal conviction, Einaugler v. Supreme Court of the State of New York, 109 F.3d 836, 840 (2d Cir. 1997) (quoting Quirama v. Michele, 983 F.2d 12, 14 (2d Cir. 1993)). A habeas court is required to consider the trial evidence in the light most favorable to the prosecution and uphold the conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (emphasis in

original). Recently addressing the Jackson standard in the habeas context, the Supreme Court explained that it "also unambiguously instructs that a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolves any such conflicts in favor of the prosecution, and must defer to that resolution.'" Cavazos v. Smith, ___ U.S. ___, ___, 132 S. Ct. 2, 6 (2011) (quoting Jackson, 443 U.S. at 326).

When considering the sufficiency of the evidence of a state conviction "[a] federal court must look to state law to determine the elements of the crime." Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002) (quoting Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999), cert. denied, 528 U.S. 1170 (2000)). Under New York law, a person is guilty of predatory sexual assault when (1) he commits the crime of rape in the first degree and (2) uses or threatens the immediate use of a dangerous instrument. N.Y. PENAL LAW § 130.95(1)(b).

A person is guilty of first degree rape when he or she engages in sexual intercourse with another person by forcible compulsion. N.Y. PENAL LAW § 130.35(1). Sexual intercourse is defined as "having its ordinary meaning and occurs upon any penetration, however slight." N.Y. PENAL LAW § 130.00[1]. Under New York law, the victim's testimony, standing alone, is sufficient to establish the crime of rape in the first degree beyond a reasonable doubt. See People v.

<u>Magee</u>, 208 A.D.2d 977, 978, 617 N.Y.S.2d 227, 228 (3d Dept. 1994) ("[C]orroboration is not necessary to support a conviction of forcible rape or sodomy[.]") (citation omitted). There is no requirement that a claim of rape be corroborated by medical evidence. <u>E.g.</u>, <u>People v. Bacchi</u>, 186 A.D.2d 663, 664, 588 N.Y.S.2d 619, 620 (2d Dept. 1992) (citation omitted).

In the present case, there was ample evidence on which a rational jury could have convicted Russell of predatory sexual assault. With regard to the first degree rape element, the sub-element of forcible compulsion was proven by C.B.'s testimony that Russell threatened her with what she believed to be a knife, got on top of her, and inserted his penis into her vagina against her will. The sub-element of penetration was sufficiently established by C.B.'s testimony that Petitioner penetrated her vagina with his penis, an act which, under New York law, constitutes sexual intercourse. <u>See</u> <u>People v. Fuller</u>, 50 N.Y.2d 628, 631, 638-39 (1980) (finding legally sufficient evidence of first degree rape where child complainant testified that the defendant came into her room, removed her pants and "put his private in [her] private" while forcefully pressing her shoulders down on the bed; while this was going on, she tried to maneuver her body away from defendant); <u>People v. Shelton</u>, 307 A.D.2d 370, 371 (2d Dept. 2003) (evidence was "legally sufficient to prove that the defendant used forcible compulsion to engage in sexual intercourse and sexual contact with

the complainant, who was five feet tall and weighed between 90 and 95 pounds, and who testified that the defendant physically restrained her as she struggled to free herself"), aff'd, 1 N.Y.3d 614 (2004). With regard to the element of using or threatening the immediate use of a dangerous instrument, the failure to locate or identify the knife does not undermine the sufficiency of the evidence, for there is no requirement under New York law that the weapon or dangerous instrument be recovered or introduced into evidence at trial. See People v. Gragnano, 63 A.D.3d 1437, 1440 (3d Dept. 2009) ("[T]he evidence adduced at trial sufficiently established [assault and criminal possession of a weapon] notwithstanding the fact that the witnesses never saw the weapon and police were not able to recover it.")).

It is a closer question as to whether C.B.'s testimony that Russell held up what appeared to her to be knife, standing alone, was sufficient to establish that Russell possessed a "dangerous instrument" for purposes of the predatory sexual assault charge. See People v. Peralta, 3 A.D.3d 353, 354 (1st Dept. 2004) (prosecution failed to prove that defendant possessed a dangerous instrument, as required to support convictions of first degree robbery and second degree burglary; although defendant pressed a hard object into back of victim, and victim claimed to believe object was a gun, defendant never stated that object was a gun, victim did not have injuries which would evidence use of dangerous

instrument, neither victim nor any other witnesses at scene saw defendant in possession of any object or substance fitting definition of dangerous instrument, and no dangerous instrument was ever recovered either from defendant or from the premises).

Unlike Peralta, however, the victim in this case saw what she believed was a knife. See People v. Washington, 229 A.D.2d 601, 602 (2d Dept. 1996) (upholding verdict finding display of a dangerous weapon where the victim testified she thought the defendant had "probably a gun or a knife, I'm not really sure"). Morever, the jury heard Russell's response to Wilson's question whether there had been a knife that "even if there was a knife, they wouldn't have found it anyways." T.730.

Drawing all inferences in favor of the prosecution and deferring to the jury's assessment of witness credibility, the Court finds that it was rational for the jury to find that the prosecution proved all of the elements of predatory sexual assault beyond a reasonable doubt.

With regard to the conviction for unlawful imprisonment in the first degree, the prosecution must prove that the defendant restrained another person under circumstances which exposed the latter to a risk of serious physical injury. N.Y. PENAL LAW § 135.10. For purposes of this offence, "'[r]estrain" means to restrict a person's movements intentionally and unlawfully in such manner as to interfere substantially with h[er] liberty by moving h[er] from

-14-

one place to another, or by confining him either in the place where the restriction commences or in a place to which [s]he has been moved, without consent and with knowledge that the restriction is unlawful." N.Y. PENAL LAW § 135.00(1).

Here, C.B. was in Petitioner's car on an isolated back road. He straddled her lap while holding what she believed to be a knife inches from her face. Although C.B. was not certain that what she observed was a knife, she believed that whatever Russell was holding could be used to hurt her. See People v. Kruppenbacher, 81 A.D.3d 1169, 1172 (3d Dept. 2011) (each victim testified to being forcibly confined to defendant's truck and being threatened by defendant with a knife; two victims testified to being taken by defendant to remote locations where they were held against their will and injured when they tried to escape; "[t]this testimony, in addition to establishing that each victim was subjected to a degree of restraint, which constituted a separate and independent criminal act, also provided a legally sufficient basis for defendant's conviction for kidnapping and unlawful imprisonment"). Deferring to the jury's "assessments of the weight of the evidence or the credibility of witnesses[,]" Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996), the evidence was legally sufficient for a rational jury to find that the prosecution had proven all elements of the offense of unlawful imprisonment beyond reasonable doubt.

**B.    Verdict Against the Weight of the Evidence**

Petitioner's assertion that his conviction was against the weight of the evidence is not cognizable on habeas review. A weight of the evidence claim is "an error of state law, for which habeas review is not available." Douglas v. Portuondo, 232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002); Correa v. Duncan, 172 F.Supp.2d 378, 381 (E.D.N.Y. 2001) ("A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15[5]"); see also Maldonado v. Scully, 86 F.3d at 35 ("assessments of the weight of the evidence . . . are for the jury and not grounds for reversal on appeal"). Thus, Petitioner's weight of the evidence claim is dismissed for failure to state a cognizable constitutional question.

**C.    Repugnant Verdicts**

Petitioner claims, as he did in his Appellate Division brief, that the verdicts were repugnant because it was impossible for him to commit predatory sexual assault, first degree rape, or unlawful imprisonment when, as he asserts, he had no weapon and was acquitted of third degree criminal possession of a weapon. Petitioner criticizes C.B.'s testimony with respect to the knife as uncertain and ambiguous. The Appellate Division rejected this claim as unpreserved for appellate review, and Respondent argues that it is procedurally defaulted based upon the adequate and independent state ground doctrine.

There is no need to address the procedural bar issue since, as Respondent argues in the alternative, the claim is not cognizable in this federal habeas proceeding. The Supreme Court has held that inconsistent verdicts do not offend the federal Constitution. See United States v. Powell, 469 U.S. 57, 58, 64-65 (1984) (holding that "consistency in the verdict is not necessary" and noting that inconsistent verdicts are often the product of "mistake, compromise, or lenity") (citing Dunn v. United States, 284 U.S. 390, 393 (1932)); see also Dowling v. United States, 493 U.S. 342 (1990) (stating that "inconsistent verdicts are constitutionally tolerable"); Harris v. Rivera, 454 U.S. 339, 345 (1981) (stating that "[i]nconsistency in a verdict is not a sufficient reason for setting it aside"). "[W]here truly inconsistent verdicts have been reached, '[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.'" Powell, 105 S.Ct. at 477 (quoting Dunn, 284 U.S. at 393 (other quotation omitted)).

"Because this Court is without power to set aside a state court conviction on the basis of repugnancy, id., it follows logically that this Court is similarly powerless to set aside a state court's erroneous determination that the jury's verdict was in fact repugnant." Brunson v. Tracy, 378 F. Supp.2d 100, 110 (E.D.N.Y. 2005) (citing Estelle v. McGuire, 502 U.S. 62, 67-68

-17-

(1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.")).

## IV. Conclusion

For the foregoing reasons, the petition filed by Brent Russell (Dkt. #1) is dismissed. Because Russell has failed to make a substantial showing of a denial of a constitutional right, the Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2). The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3) and FED. R. APP. P. 24(a)(3), that any appeal from this Decision and Order would not be taken in good faith and therefore the Court denies leave to appeal as a poor person. See Coppedge v. United States, 369 U.S. 438, 445-46 (1962).

Any application for leave to appeal in forma pauperis must be made to the Second Circuit Court of Appeals in accordance with FED. R. APP. P. 24(a)(1), (4), & (5). See id. Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action.

**SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     Rochester, New York
           June 21, 2012

-18-